UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 26-cr-10007-AK |
| HONG WANG | ) ) ) | |

**MOTION FOR RETURN OF PROPERTY UNDER FED. R. CRIM. P. 41(g)**

Hong Wang, by and through undersigned counsel, respectfully moves this Honorable Court for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) and the return of property seized from four Vanguard accounts pursuant to seizure warrants 25-MJ-7471-JCB through 25-MJ-7474-JCB, issued on September 30, 2025. Copies of the warrants are attached as Exhibits 1 through 4, and the supporting affidavit of FBI Special Agent Keith Brown is attached as Exhibit 5.

The warrants rest on the materially misleading premise that as much as $489,739.38 in "funds, monies, and other things of value" in the four Vanguard accounts are "traceable to proceeds" of alleged securities fraud. Brown Aff. ¶¶ 3, 7, 34, 37. That premise cannot withstand scrutiny, and the warrants should be vacated and the seized property returned.

First, the affidavit is materially misleading because it omits the most obvious alternative explanation for the December 13, 2023 price movement on which the government's theory depends. Before the CFT7455 announcement referenced in paragraph 31, and earlier that same day, C4 Therapeutics ("C4") had disclosed a major Merck collaboration potentially worth up to $2.5 billion that was a separate and obvious market moving event that provided an alternative

1

explanation for much or all of the ensuing price movement.[1] By leaving out that intervening and highly significant news, the affidavit presents a narrative that is false at least by omission. Under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) and its progeny, probable cause cannot be built on an affidavit that withholds facts necessary to prevent technically accurate statements from becoming affirmatively misleading.

Second, the government's forfeiture theory improperly conflates unrealized appreciation with forfeitable proceeds. The affidavit treats unsold shares and later account balances as though they were already realized gains traceable to unlawful transactions. But where lawful goods are sold in an unlawful manner, Congress defined "proceeds" as the "amount of money acquired through the illegal transactions." 18 U.S.C. § 981(a)(2)(B). Unrealized appreciation in stock that was never sold is not "money acquired." It is, at most, a fluctuating value that may rise, fall, or disappear altogether. The government therefore cannot transform unsold shares, or unrelated cash and securities later sitting in the accounts, into forfeitable "proceeds" merely by labeling them as such.

Third, even applying the First Circuit's civil disgorgement framework in *SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983), any attempt to measure gains from insider trading must isolate the portion of the price movement attributable to the inside information.[2] The affidavit does not do that. Instead, it attributes the entire December 13, 2023 increase, and even later account balances, to the CFT7455 announcement while ignoring the contemporaneous Merck news and the undisputed presence of other non-C4 assets in the same accounts. That is not tracing. It is

---

[1] As a point of reference, C4's market capitalization on that day, *i.e.* the market's valuation of the entire company, was approximately $160 million.

[2] Section 2B1.4 of the Sentencing Guidelines likewise defines gain as "the total *increase in value realized through trading* in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . ." (emphasis added).

2

speculation dressed up as arithmetic. Because the seizures were obtained on a materially misleading affidavit and an overbroad, legally defective proceeds theory, this Honorable Court should hold a *Franks* hearing, vacate the seizure warrants, and order the seized property returned.

## I.    Relevant Background

Special Agent Keith Brown's affidavit alleged that Wang, while consulting for C4, learned positive nonpublic information concerning an anticipated December 2023 announcement about CFT7455 and then accumulated C4 stock in four Vanguard accounts. Brown Aff. ¶¶ 11-31. The affidavit further alleged that Wang sold 20,000 shares on December 13, 2023 for realized profit of $48,370 and, as of approximately December 14, 2023, was also sitting on $441,369.38 in unrealized profit. *Id.* ¶¶ 31-32. Based on those figures, the affidavit asserted that Wang had made a total of $489,739.38 in realized and unrealized gains and that equivalent amounts in the four accounts were therefore "traceable [] proceeds" subject to seizure. *Id.* ¶¶ 34-38.

The seizure theory depends on paragraph 31's assertion that, "[o]n or about December 13, 2023, the share price of C4 increased by 135 percent," followed by the unstated premise that the increase was attributable to the December 12, 2023 CFT7455 announcement alone. *Id.* ¶ 31. But the affidavit omitted another major event that same day: C4, which had a market capitalization of approximately $160 million, announced "an exclusive license and collaboration agreement … to develop degrader-antibody conjugates" with Merck. Exhibit 6. Under that arrangement, C4 received a "$10 million upfront payment", potential "milestone payments totaling approximately $600 million, as well as tiered royalties on future sales", and "up to approximately $2.5 billion in potential payments across the entire collaboration." Exhibit 6. There is no allegation that Wang had any knowledge about the Merck transaction prior to its public announcement.

Later that day, C4 issued the CFT7455 release and announced a 4:30 p.m. investor webcast to discuss that data. Exhibit 7. The December 12, 2023 CFT7455 release did not announce a completed pivotal trial, an FDA approval, or any final efficacy determination. It only reported interim results from an ongoing Phase 1/2 dose-escalation study, which stated that CFT7455 was "well tolerated" and showed "promising signs" of anti-myeloma activity, and expressly acknowledged that dose escalation was still continuing and that complete Phase 1 data was not expected until 2024. In other words, the release described a preliminary clinical update, not the sort of definitive event from which the government can plausibly attribute the entire ensuing market move to CFT7455.[3]

Importantly, C4's stock price had already doubled on the Merck announcement before the CFT7455 press release was disseminated. *See* Exhibit 8. Contemporaneous analyst and media coverage likewise attributed the stock price movements, including on December 13, 2023, to the Merck transaction, not to CFT7455. *See* Exhibit 9 (December 13, 2023 article titled *C4 Therapeutics (CCCC) Soars on Oncology Deal with Merck*). Likewise, historically, positive announcements relating to CFT7455 produced little reaction or even negative market responses,

---

[3] Although materiality is ordinarily a fact specific question, the CFT7455 release was far too preliminary to bear the weight the affidavit places on it. Early phase cancer trials are designed chiefly to evaluate safety, tolerability, side effects, and dose, not to establish definitive clinical benefit. *See* How Do Clinical Trials Work?, Nat'l Cancer Inst., available at https://www.cancer.gov/research/participate/clinical-trials/how-trials-work (last visited April 16, 2026) (explaining that phases 1 and 2 test safety, side effects, and safe dose, while later phases compare a treatment to current standards). Consistent with that reality, published research shows that the median clinical development time for drugs is approximately 8.3 years. *See* Dean G. Brown *et al.,* Clinical Development Times for Innovative Drugs, 21 Nat. Rev. Drug Discov. 793, 793–94, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9869766/ (last visited April 16, 2026). Thus, a December 2023 press release describing interim Phase 1/2 data was at most an early and tentative signal in a development process that ordinarily takes years, not days.

further undermining any claim that the December price movements can be ascribed solely to the CFT7455 disclosure:[4]

| Announcement Date (AD) | Headline | Announcement Date (AD) | AD+1 | AD+2 | AD+3 | AD+1 % vs AD | AD+2 % vs AD | AD+3 % vs AD |
|---|---|---|---|---|---|---|---|---|
| 1/19/2021 | FDA clearance for CFT7455 Testing | | $39.53 | $37.14 | $36.87 | $39.58 | -6.05 | -6.73 | 0.13 |
| 6/14/2021 | First patient dosed – CFT7455 | | $42.11 | $37.66 | $38.12 | $37.08 | -10.57 | -9.48 | -11.94 |
| 6/21/2021 | CFT7455 Positive Pre-clinal Data | | $38.49 | $38.34 | $37.76 | $37.28 | -0.39 | -1.9 | -3.14 |
| 4/8/2022 | CFT7455 Positive Clinical Data | | $11.32 | $8.01 | $8.76 | $9.35 | -29.24 | -22.61 | -17.4 |
| 11/28/2023 | 12/12/2023 Webcast announced for CFT7455 new dose escalation data | | $1.57 | $1.51 | $1.63 | $1.60 | -3.82 | 3.82 | 1.91 |
| 11/5/2024 | CFT7455 data selected for presentation at American Society for Hematology (ASH) Annual Meeting | | $6.09 | $5.97 | $6.04 | $6.06 | -1.97 | -0.82 | -0.49 |
| 12/8/2024 | ASH 2024 presentation on CFT7455 | | $4.42 | $4.19 | $4.31 | $4.71 | -5.2 | -2.49 | 6.56 |
| 1/14/2025 | CFT7455 /Cemsidomide data "potentially best-in-class" | | $3.74 | $4.04 | $3.86 | $3.94 | 8.02 | 3.21 | 5.35 |
| 9/3/2025 | Update on CFT7455 /Cemsidomide first-in-human study scheduled | | $2.56 | $2.67 | $2.72 | $2.71 | 4.3 | 6.25 | 5.86 |
| 9/20/2025 | Positive results from CFT7455/Cemsidomide study | | $3.16 | $2.61 | $2.59 | $2.42 | -17.41 | -18.04 | -23.42 |

Agent Brown also failed to disclose that the actual trading records do not support his leap from the C4 trades to the seizure of $489,739.38 from the four accounts. *See* Exhibit 10. The Vanguard records show that Wang purchased 160,430 C4 shares on or before December 12, 2023, at a total cost of $306,314.92, sold only 20,000 shares on December 13, 2023, for $92,500.00, and retained 140,430 shares from those original purchases thereafter. Using the conventional first-in, first-out method, the realized profit on the December 13 sales was just $48,370.00. And as of September 30, 2025 – the date Agent Brown submitted his affidavit and obtained the seizure warrants – the remaining original shares had a market value of $311,754.60 based on a $2.22 closing price, reflecting approximately $49,569.68 in unrealized appreciation, not the $441,369.38 figure Agent Brown presented to the Magistrate Judge. Brown Aff. ¶ 32. Critically, those 140,430

---

[4] To date, CFT7455 has never reached the market.

shares had not been sold as of September 30, 2025, and they remain unsold today. Agent Brown's affidavit omitted these facts and instead presented a grossly inflated and misleading picture of both the amount and nature of any purported proceeds.

Finally, Agent Brown asserted that the balances in the four Vanguard accounts never fell below the alleged profit figures and therefore remained forfeitable. Brown Aff. ¶¶ 35-37. But he never disclosed that Wang continued trading after December 13, added additional capital into C4[5] and other investments, and held substantial investments in other securities such as UnitedHealth and Tesla. On this record, the affidavit's tracing theory is not merely incomplete, it is affirmatively misleading.

## II.    Legal Standard

Fed. R. Crim. P 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return," and that "[t]he court must receive evidence on any factual issue necessary to decide the motion." Because these seizure warrants were issued under forfeiture authority incorporated through 18 U.S.C. § 981 and 28 U.S.C. § 2461(c), the government had to establish probable cause that the specific property seized would, in the event of conviction, be subject to forfeiture as proceeds traceable to the alleged securities fraud. Brown Aff. ¶¶ 7-10. That burden was not met here.

The probable cause standard requires "more than bare suspicion." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Rather, probable cause "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been . . . committed." *Id.* at 175-76 (citation omitted); *United States v. Certain Real Prop. Located*

---

[5] Including when he was no longer employed by the company.

*on Hanson Brook, Town House Rd., Waterboro, Cnty. of York, State of Me.*, 770 F. Supp. 722, 731 (D. Me. 1991) ("The Court's role when reviewing a probable cause determination is to ensure that, based on the totality of the circumstances, the Magistrate Judge had a substantial basis for concluding that the seizure was supported by probable cause."). Application of a lesser standard would "leave law-abiding citizens to the mercy of the officers' whim or caprice." *Brinegar*, 338 U.S. at 176.  Absent exigent circumstances, the probable cause determination must be made by a "neutral and detached magistrate." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (citation omitted). And officers must present sufficient information to that Magistrate to allow her to conduct the required analysis.  In other words, the Magistrate's "action cannot be a mere ratification of the bare conclusions of others." *Id*. at 239.

While an affidavit is presumed valid, that presumption may be overcome by a showing that it contains either (1) a "false statement [made] knowingly and intentionally, or with reckless disregard for the truth," *Franks v. Delaware*, 438 U.S. 154, 155 (1978) or (2) "technically accurate statements" that "have been rendered misleading by material omissions," *United States v. Scalia*, 993 F.2d 984, 987 (1st Cir.1993). When an affiant recklessly omits material information, the affidavit must be reformed to include the omitted facts and then reassessed for probable cause. *See United States v. McLellan*, 792 F.3d 200, 209-10 (1st Cir. 2015).

### III.    Argument

#### A. The seizure warrants rest on material omissions.

Here, the central omissions concern causation and the value of any purported proceeds. Paragraph 31 states that C4's share price increased by 135 percent on December 13, 2023 and then immediately pivots to Wang's sales and supposed profits. Brown Aff. ¶ 31. What it does not tell the Magistrate Judge is that, hours before the CFT7455 disclosure on which the affidavit focuses,

7

C4 had already released separate, highly material Merck collaboration news. A reasonable Magistrate Judge deciding whether later gains were traceable to alleged insider trading in CFT7455 information would plainly have wanted to know that another major catalyst entered the market first.

That omission matters under both common sense and *Franks*. The omitted Merck information was not collateral. C4 publicly disclosed a $10 million upfront payment, approximately $600 million in milestone payments, and total potential payments in the billions to a company then valued at roughly $160 million. That disclosure was itself plainly market moving and therefore caused the stock price to surge. Contemporaneous market commentary emphasized that the gains were driven by the Merck transaction and that the stock had already risen sharply before the afternoon CFT7455 announcement. Further confirming the relative insignificance of the CFT7455 announcement is the fact that prior positive announcements regarding that same drug had not produced comparable appreciation. Once those omitted facts are restored, the affidavit no longer supports probable cause to attribute the December 13 price movement exclusively – or even predominantly – to the CFT7455 announcement.

Paragraphs 32 and 34 are materially misleading for an additional and independent reason. They present a December 14, 2023 snapshot – $441,369.38 in purported "unrealized profit" – as though it meaningfully described the property seized nearly two years later, on September 30, 2025. Brown Aff. ¶¶ 32, 34. It did not. By September 30, 2025, the original 140,430 shares remaining after the December 13 sales reflected only approximately $49,569.68 in unrealized appreciation. Yet the affidavit never disclosed that dramatic change in value, never explained whether those original shares were still being held, and never distinguished between the original C4 shares and later additions to the brokerage accounts. A snapshot from December 14, 2023

cannot be carried forward unchanged and used in September 2025 as though it still established the existence and amount of forfeitable proceeds, particularly where the stock was never sold.

Paragraphs 35 through 37 are likewise materially misleading. Those paragraphs assert that, because the balances in the accounts never fell below the government's selected figures, equivalent amounts necessarily remained traceable proceeds. Brown Aff. ¶¶ 35–37. But the affidavit omitted the most important facts needed to evaluate that claim: the accounts contained other holdings and Wang made later deposits and purchases. In fungible brokerage accounts containing multiple securities, cash, and later transactions, the fact that an account balance never dropped below a certain level does not establish that the same amount remained traceable to the alleged offense. And because those omitted facts bear directly on whether any seized funds were in fact proceeds of the alleged offense, the omissions go to the heart of probable cause.

At a minimum, the Court should reform the affidavit to include the omitted Merck announcement, the later market facts, and the non-C4 account activity, and then reassess whether probable cause remains. See *United States v. Tanguay*, 811 F.3d 78, 82 (1st Cir. 2016). Once the affidavit is corrected to include what Agent Brown left out, probable cause to seize the purported gains disappears.

### B. Unrealized appreciation in unsold shares is not "proceeds".

The government did not seek to seize the allegedly tainted C4 shares themselves. Instead, it obtained warrants authorizing the seizure of dollar amounts in "funds, monies, and other things of value" held in four brokerage accounts. *See* Brown Aff. ¶ 3; Exhibits 1-4. That distinction matters.

For forfeiture purposes, Congress defined "proceeds" differently depending on the type of offense. *See* 18 U.S.C. § 981(a)(2). In cases involving lawful goods or lawful services sold or

provided in an illegal manner, "proceeds" means "the amount of *money acquired* through the illegal transactions resulting in the forfeiture." 18 U.S.C. § 981(a)(2)(B) (emphasis added). Securities are lawful goods. *See United States v. Nacchio*, 573 F.3d 1062, 1090 (10th Cir. 2009) ("acts of insider trading involved lawful goods sold in an illegal manner"); *United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012) ("A security is a "lawful good[ ]" for the purposes of § 981(a)(2)(B), the purchase or sale of which, if done based upon improperly obtained material nonpublic inside information, is "sold ... in an illegal manner.") (internal citations and quotations omitted). The relevant "proceeds" under the government's insider trading theory are therefore the "money acquired" through the allegedly unlawful transactions, not a hypothetical estimate of what unsold shares may have been worth on some arbitrarily selected date. Put simply, an unrealized gain on shares that were never sold is not "money acquired," because no transaction ever occurred that converted that appreciation into money received by the defendant. *See Contorinis*, 692 F.3d at 145 n.3 ("Because § 981(a)(2)(B) defines 'proceeds' as the 'money acquired ... less the direct costs incurred' it seems that the only money that should be subject to forfeiture in an insider trading case is *money acquired when shares are traded based upon inside information at a gain*.") (emphasis added).

The affidavit's theory collapses that distinction. It converts unsold stock appreciation into a "money acquired" figure and then treats unrelated account assets as though they were automatically forfeitable substitutes.[6] Brown Aff. ¶¶ 32, 34-37. But unrealized appreciation is not "money acquired." It is an estimate contingent on a later sale, later market movement, and later account decisions. If the government believed the unsold C4 shares themselves were forfeitable

---

[6] Permitting the government to do so in this case and others would also subvert the requirements of 21 USC §853(p).

property or property traceable to the alleged offense, it could have sought to restrain or seize those shares. It did not.

That problem is especially acute here because the original remaining shares, as of the warrant date, no longer supported anything close to the affidavit's unrealized profit number. Thus, even on the government's own theory, the warrant seized amounts untethered to the value of the allegedly tainted original position and in turn seized assets that are not related in any way to alleged insider trading.[7]

### C. Even if civil disgorgement principles were relevant here, any gain calculation would have to be limited to gains causally attributable to the alleged inside information.

Even assuming, *arguendo*, that civil disgorgement principles have any place in the forfeiture context – which they do not – *SEC v. MacDonald* does not support the government's seizure theory. In *MacDonald*, the First Circuit sitting *en banc* made clear that insider trading gain must be tethered to gains resulting from the alleged insider information. 699 F.2d 47 (1st Cir. 1983). The court held that disgorgement is generally measured by the difference between the defendant's trading price and the market price "a reasonable time after public dissemination of the inside information," because once the market has absorbed the news, subsequent gains or losses are no longer attributable to the fraud, but to independent market forces and later developments. *Id.* at 54–56. The court's reasoning was expressly tied to the absence of confounding events: there was "no evidence of other material events during the period in question," and thus, absent such events, "the market itself may be the best indicator" of how long it took the public to digest the disclosed information. *Id.* at 56.

---

[7] Such a grossly disproportionate forfeiture also raises serious concerns under the Eighth Amendment, an issue not addressed here.

11

Here, the opposite is true. There was another material event: the Merck collaboration announcement issued before the market opened on December 12, 2023. Yet Agent Brown omitted that announcement entirely. That omission is fatal to any effort to invoke *MacDonald*, because a court cannot determine what constitutes a "reasonable time" for the market to absorb the allegedly inside information or isolate what portion of any price movement was caused by that information without being told that another major market moving event occurred at the same time.

Other authorities confirm the same point. *See, e.g., United States v. Nacchio*, 573 F.3d 1062, 1077–78 (10th Cir. 2009) (rejecting a gain analysis that ignored a "myriad" of factors unrelated to the fraud that could have contributed to the stock price increase); *SEC v. Wyly*, 56 F. Supp. 3d 260, 265–66 (S.D.N.Y. 2014) (disgorgement must be a "reasonable approximation of profits causally connected to the violation"). In other words, *MacDonald* requires exclusion of appreciation attributable to independent market forces rather than the inside information itself. Where a separate, independent announcement accounts for all or a substantial portion of the price increase, the gain attributable to the insider trading must be reduced accordingly. *See United States v. Grabske*, 260 F. Supp. 2d 866, 867 (N.D. Cal. 2002) (using "event study" to "determine the amount of stock price inflation due to fraud").

Agent Brown's affidavit performed none of that analysis. It made no attempt to isolate any price increase attributable to the December 12 CFT7455 announcement. Instead, it attributed the December 13 stock movement to CFT7455 alone, ignored the prior Merck announcement, and then used that incomplete and misleading premise to construct a $489,739.38 seizure theory. Brown Aff. ¶¶ 31–37. But if, as the omitted facts indicate, the stock had already surged on the Merck news, then the later trading price cannot simply be attributed wholesale to CFT7455. Nor is the defect cured by observing that the stock remained elevated on December 13. Continued

12

momentum after a major collaboration announcement remains attributable to that announcement unless the government can show otherwise.

At a minimum, these omissions defeat probable cause for any seizure amount premised on the assertion that all – or even most – of the later appreciation was attributable to CFT7455. And if the government intended to rely on *MacDonald* reasoning at all, it was required first to confront the causal question that Agent Brown's affidavit obscured rather than answered.

## IV.    Conclusion

For the foregoing reasons, the defense respectfully requests this Honorable Court to order an evidentiary *Franks* hearing, vacate the seizure warrants, and order the seized property returned.

**COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

Undersigned counsel conferred with counsel for the government who opposes this request.

Respectfully Submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
max@mnpc.law

## **CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, April 17, 2026, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg